IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KYLA DEWOLFE-JOHNSON,

                      Plaintiff,                  OPINION AND ORDER

v.

                                                      12-cv-00095-wmc

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                      Defendant.

---

Pursuant to 42 U.S.C. § 405(g), plaintiff Kyla DeWolfe-Johnson seeks judicial review of a final administrative decision of the Commissioner of Social Security, affirming an administrative law judge's finding that DeWolfe-Johnson was not disabled within the meaning of the Social Security Act. For the reasons set forth below, the case will be remanded to the Commissioner for rehearing.

## BACKGROUND[1]

### I. Procedural History

On May 26, 2011, Administrative Law Judge ("ALJ") Ben Barnett issued a decision denying DeWolfe-Johnson's application for Disability Insurance Benefits ("DIB"). (AR 75.) DeWolfe-Johnson filed a timely request for review of the ALJ's decision. On December 13, 2011, the Appeals Council denied DeWolfe-Johnson's request for review, making the ALJ's decision the final determination of the

---

[1] The following facts are drawn from the administrative record, which can be found at dkt. #5.

Commissioner.  (AR 1.)  On February 13, 2012, DeWolfe-Johnson filed a timely complaint for judicial review in this court pursuant to 42 U.S.C. § 405(g).

DeWolfe-Johnson alleges disability based on both physical and mental impairments.  In September 2002, DeWolfe-Johnson suffered a traumatic brain injury and shoulder injuries as a result of a serious bicycle accident.  (AR 70, 127.)  DeWolfe-Johnson recovered from her injuries and continued to work as an electrical engineer until 2008, when she experienced another traumatic brain injury.  (AR 70.)  Following this second injury, DeWolfe-Johnson's treating physician, Dr. Julie Champagne, M.D., restricted her to part-time work.  (AR 547-48, 1193-94.)  In October 2008, DeWolfe-Johnson's employment was terminated.  DeWolfe-Johnson's depression and anxiety worsened following her termination and allegedly she has struggled to find a combination of medications that provide lasting control of her emotional impairments.  Her multiple physical impairments include, degenerative disc disease, multidirectional instability in bilateral shoulders, bilateral carpal tunnel syndrome, migraine headaches, and fibromyalgia.

## II. Relevant Medical History

### A. Overview

DeWolfe-Johnson joined the Navy in 1991.[2]  After completing her training, however, she was hospitalized with severe depression, agoraphobia and panic disorder for almost three months.  She subsequently received a medical discharge.

---

[2] Most of the medical records refer to Kyla DeWolfe, apparently plaintiff's maiden name before her marriage in July 2010.

2

In 2002, DeWolfe-Johnson was involved in bicycle accident where she flew forward over the handlebars, landing on her face and chin.  Her primary care physician at Duluth Internal Medicine noted following the accident that she was going about 20 miles an hour at the time of collision.  An MRI of her brain after the accident showed a few scattered punctate and very nonspecific areas of increased signal in the periventricular white matter bilaterally.

After her 2002 bicycle accident, DeWolfe-Johnson continued to suffer from depression, anxiety, headaches and a host of other physical ailments, including neck, shoulder and back pain.  In February 2008, DeWolfe-Johnson experienced a second traumatic brain injury when she hit her head on a wooden beam while working at home. (AR 561.)

On July 7, 2008, DeWolfe-Johnson saw Dr. Julie Champagne, M.D.  Her initial assessment found that DeWolfe-Johnson suffered from persistent cognitive difficulties and residual deficits due to a mild traumatic brain injury experienced in the 2002 bicycle accident.  On October 29, 2008, DeWolfe-Johnson underwent neuropsychological testing conducted by Anita Sim, Ph.D.  DeWolfe-Johnson's test results fell generally within the normal to superior range and her personality testing was consistent with individuals with a significant amount of somatic complaints.  In Dr. Sim's opinion, DeWolfe-Johnson's difficulties were not related to brain damage, but were secondary to psychological influences and/or depressed cognitive function due to issues such as pain and fatigue.

Almost a year later, on September 2, 2009, DeWolfe-Johnson was seen at the Duluth Clinic for ongoing pain, primarily in the *right* shoulder girdle region with

paresthesias and numbness in the first three digits of the right hand, as well as symptoms on the left hand. The diagnoses were probable bilateral carpal tunnel syndrome; possible mild left ulnar neuropathy versus thoracic outlet syndrome/pectoralis minor syndrome; and muscle spasms. (AR 442-44.) On November 18, 2009, DeWolfe-Johnson was also diagnosed with active fibromyalgia. That exam noted her fibromyalgia would cause significant occupational effects including decreased concentration, increased absenteeism and chronic pain issues, as well as mild to moderate limitations of her daily activities. (AR 660-65.)

On August 23, 2010, the VA issued a decision, finding DeWolfe-Johnson entitled to benefits for individual unemployability effective July 31, 2009. That decision determined that DeWolfe-Johnson's service-connected disabilities included major depression, fibromyalgia, degenerative disc disease of the lumbar spine and irritable bowel syndrome. On February 7, 2011, DeWolfe-Johnson saw an orthopedic surgeon for an evaluation of her bilateral shoulder pain. Shoulder X-rays taken at the time indicated that she had mild subluxation of the left shoulder joint, as well as multidirectional instability. (AR 943-46.)

### B. Dr. Julie Champagne, M.D., Treating Physician

Dr. Julie Champagne, M.D., has been DeWolfe-Johnson's treating physician since first seeing her in July of 2008 for persistent cognitive difficulties and a likely mild traumatic brain injury. On October 2, 2008, Dr. Champagne saw DeWolfe-Johnson and indicated that she could return to light, modified work duty. Dr. Champagne recommended that DeWolfe-Johnson work four hours a day, three days a week, in a

quiet environment where she was allowed to take frequent breaks for stretching and relaxation. DeWolfe-Johnson was to continue with this modified work schedule for the next eight to twelve weeks if tolerated. In July 2009, Dr. Champagne's records indicate that DeWolfe-Johnson had become more anxious, had difficulty sleeping and still suffered from headaches.

On April 8, 2011, Dr. Champagne updated her assessment of DeWolfe-Johnson's mental functional limitations. Dr. Champagne found that DeWolfe-Johnson's ability to perform cognitive tasks decreases as the level of complexity increases, and she experiences increased fatigue, anxiety and stress in those situations, making her unable to tolerate a full-time, high stress job. (AR 1294.) While finding that DeWolfe-Johnson has some mild residual cognitive deficits from her 2002 traumatic brain injury, Dr. Champagne concluded that her "mental health issues are contributing the lion's share of difficulties/barriers to completing tasks and tolerating full-time employment." (AR 1295.) Dr. Champagne also determined that DeWolfe-Johnson is frequently unable to (1) complete a normal workday and workweek without interruptions from psychological-based symptoms; or (2) perform at a consistent pace without an unreasonable number of lengthy rest periods. (*Id.*)

Regarding DeWolfe-Johnson's physical restrictions, Dr. Champagne found she could sit for less than two hours at a time; needed breaks every forty-five minutes to an hour to adjust her position; and could only stand for twenty minutes at a time before needing to sit for half an hour. (AR 1297.) Dr. Champagne also found that DeWolfe-Johnson was able to occasionally (up to 1/3 of workday) lift between six to ten pounds,

5

and frequently (up to 2/3 of workday) lift three to six pounds. *Id.* Dr. Champagne's overall opinion was that DeWolfe-Johnson should be able to tolerate four to six hours of work per day, but pain, fatigue and anxiety would limit her ability to complete an eight hour work day.

**III. Administrative Law Judge's Decision**

ALJ Barnett found that DeWolfe-Johnson had engaged in substantial gainful activity ("SGA") from the time of her alleged onset date, September 12, 2002, through August 4, 2008. (AR. 65.) She also found that DeWolfe-Johnson had the following severe impairments: degenerative disc disease, multidirectional instability in bilateral shoulders, bilateral carpal tunnel syndrome, migraine headaches, fibromyalgia, history of traumatic brain injury, cognitive disorder, depression and anxiety. (*Id*.)

Still, the ALJ found DeWolfe-Johnson to have the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b). (AR 67.) Specifically, the ALJ determined that DeWolfe-Johnson's RFC was limited to the following:

> [C]laimant must be given a sit/stand option, allowing the claimant to sit or stand alternatively and at-will, provided that she is not off-task more than 10% of the work period; she can do no climbing of ladders, ropes, or scaffolds; the claimant is limited to frequent balancing; she can do no more than bilateral reaching overhead; she can do gross and fine manipulation; she is limited to simple, routine, and repetitive tasks; she can have no more than brief and superficial interaction with the public and co-workers.

(*Id*.)

At step four, the ALJ determined that DeWolfe-Johnson was unable to perform any past relevant work as an electrical engineer or an office assistant. (AR 74.) Turning

6

to step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that that claimant can perform." (*Id.*) Accordingly, the ALJ found that DeWolfe-Johnson was *not* under a disability, as defined in the Social Security Act, from September 12, 2002.

## OPINION

A federal court reviews an ALJ's decision with deference and will uphold a denial of benefits unless it is not supported by substantial evidence or is based on an error of law. 42 U.S.C. § 405(g); *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Even so, a district court may not simply "rubber-stamp" the Commissioner's decision without a critical review of the evidence. *See Ehrhart v. Secretary of Health and Human Servs.,* 969 F.2d 534, 538 (7th Cir. 1992). A decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ must also explain his "analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Id. See Herron v. Shalala*, 19 F.3d 329, 333–34 (7th Cir. 1994). When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence

to her conclusion. *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001). That, the ALJ here decidedly did not do.

I. **Credibility Determination**

The ALJ determined that while DeWolfe-Johnson's medical impairments could reasonably be expected to cause her alleged symptoms, her statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible." (AR 68.) In reviewing credibility, the court is cognizant that such assessments are generally the province of the ALJ -- being overturned only if patently wrong. *See Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir.2003). With all due deference, however, ALJ Barnett *improperly* relied on DeWolfe-Johnson's activities of daily living as a basis for discounting her testimony by failing to even discuss how such activities *were or were not* comparable to engaging in full-time work.

When assessing a claimant's credibility, the ALJ must take into consideration the difference between an ability to participate in physical activities done at the claimant's time and pace, and an ability to complete a regular work week at the employer's pace. *Carradine v. Barhart,* 360 F.3d 751, 753 (7th Cir. 2004). Despite the severe limitations noted by her treating physician, this analysis is wholly absent from the ALJ's decision. Instead, the ALJ repeatedly quotes out of context a singular statement from the Function Report Form (Form SSA-3373-BK) that DeWolfe-Johnson completed for the Social Security Administration in 2009, where she wrote of her ability to do "light cleaning,

8

laundry, dishes, and some yard chores."[3]  (AR 71.)

Because of this description, the ALJ reasoned that DeWolfe-Johnson's testimony should be discounted. After listing these activities, however, the ALJ fails to engage in any analysis necessary to demonstrate their similarity (or differences) to a full-time job where DeWolfe-Johnson would be held to a minimum standard of performance. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (stating that "the ALJ mentions Stewart's ability to cook, clean, do laundry, and vacuum at her home, but those activities do not necessarily establish that a person is capable of engaging in substantial gainful activity"). Rather, the ALJ chose to characterize these listed activities, in conclusory fashion, as "work-like," and then rely on those same activities as a basis to discount DeWolfe-Johnson's other testimony.

The ALJ's discussion of daily living also neglected to consider evidence in the record that corroborated her testimony and indicated that her ability to complete daily tasks without assistance is extremely limited. *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence"); *see also Clifford v. Apfel*, 227 F.3d at 872.

Finally, in discounting DeWolfe-Johnson's statement's regarding her depression and anxiety, the ALJ not only references her activities of daily living, but also purports to rely on the fact that DeWolfe-Johnson got married and went on a honeymoon as support

---

[3] The full statement in the Function Report, which the ALJ only cites a portion of, was: "I am able to do light cleaning, laundry, dishes, and some yard chores although I haven't been up to *anything more than the bare minimum for probably the last 16 months.*" (AR 71)(emphasis added).

9

for his conclusion that the depression and difficulty leaving the house are not as severe as alleged. (AR 71.) The fact that DeWolfe-Johnson engaged in these activities could be probative, but they are singular events, which is not even discussed in the greater context of the medical evidence related to DeWolfe-Johnson's mental health impairments. Certainly, the ALJ is entitled to consider such anecdotal evidence, but he must also discuss *how* they allow for a claimant to engage in full-time employment with undisputed, multiple and severe limitations. Otherwise, the ALJ's reliance on such evidence amounts to impermissible cherry-picking to bolster a conclusory assertion. *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000). That is precisely what has occurred here, providing further cause for remand.

## II. Treating Physician

Even if the ALJ could somehow satisfactorily explain his reliance on mere anecdotal evidence, he erred even more fundamentally by failing to give proper weight to the opinion of DeWolfe-Johnson's treating physician, Dr. Julie Champagne. The Seventh Circuit has repeatedly addressed the appropriate standards that the Commissioner must follow when weighing the opinions from a treating physician, most recently in *Jelinek v. Astrue*, 662 F.3d 805 (7th Cir. 2011). In particular, a treating physician's opinion that is "consistent with the record is generally entitled to controlling weight ... [while] an ALJ who chooses to reject a treating physician's opinion must provide a sound explanation" for doing so. *Id.* at 881 (citing 20 C.F.R. 404.1527(d)(2)). Additionally, "[i]f an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the (1) length, nature, and extent of the

10

treatment relationship, (2) frequency of examination, (3) the physician's specialty, (4) the types of tests performed, and (5) the consistency and supportability of the physician's opinion." *Scott v. Astrue*, 647 F.3d 734, (7th Cir. 2011); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 CFR 404.1527(d)(2).

Instead, ALJ Barnett attempted to justify his conclusion that little weight should be given to Dr. Champagne's opinion regarding DeWolfe-Johnson's mental impairments because it "did not properly account for all evidence in the record." (AR 72-73.) In response, DeWolfe-Johnson contends persuasively that the facts do not support the ALJ's conclusion and, as a result, the ALJ failed to provide a sound explanation for the lack of weight afforded to Dr. Champagne's opinion as DeWolfe-Johnson's undisputed, long-term treating physician. The court agrees. An ALJ may not selectively consider a treating physician's medical reports; he must consider all the relevant evidence in the record as a whole. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

Here, ALJ Barnett expressly chose to base his determination on a few specific facts and fails to consider them in the context of the greater objective medical record. This conclusory analysis is inconsistent with Seventh Circuit case-law. *See Clifford*, 227 F.3d at 872. For example, the ALJ highlights how DeWolfe-Johnson benefitted from taking Lexapro, but does not discuss how a positive response to the medication would have enabled her to work full-time, much less how she will suddenly be able to handle all the other severe stressors in her life. Similarly problematic is the ALJ's characterization of DeWolfe-Johnson's marriage and honeymoon as inconsistent with Dr. Champagne's findings. On their face, DeWolfe-Johnson's ability to engage in those limited activities

11

neither supports nor discredits Dr. Champagne's opinion. Without more, this, too, can hardly provide a sound explanation to justify rejection of Dr. Champagne's opinions as a treating physician and only serves to reinforce the need for remand.

Finally, the ALJ failed to address meaningfully *any* of the factors laid out in 20 C.F.R. § 404.1527(d)(2)-(6) and § 416.927(d)(2)-(6). Those factors have not even been addressed by the ALJ's decision to apportion weight to the treating physician's opinion -- providing further cause for remand. In reviewing the ALJ's analysis, there is no discussion of the *length, nature and extent* of the treating relationship. No attempt, in this case, is made to explain how these factors apply. For example, it would seem noteworthy that Dr. Champagne treated DeWolfe-Johnson over a period of several years, beginning in July 2008, including numerous clinical examinations. Indeed, factors such as the long-term nature of the treating relationship would seem to point in favor of DeWolfe-Johnson's position. However, the court will leave that analysis to the ALJ for further consideration on remand. *See Scott*, 647 F.3d 734.

### III. Non-Acceptable Medical Source

On March 11, 2011, Jeanette Merrill MA, APRN, BC, also provided a letter that supported DeWolfe-Johnson's claim for disability benefits. Nurse Merrill had also seen DeWolfe-Johnson for some time (since May 2, 2008). Among other things, she opined that DeWolfe-Johnson had depression, anxiety and sleep problems, concluding that she would be unable to tolerate "stressful work environment[s]." (*Id*.) (AR 1214.) The ALJ, therefore, afforded Nurse Merrill's opinion little weight. DeWolfe-Johnson challenges this assessment.

While a clinical nurse's opinion does not command controlling weight, SSR 06-03p provides factors that facilitate an analysis below. Specifically, when weighing a medical source's opinion, SSR 06-03p requires consideration of the following factors: "(1) How long the source has known and how frequently the source has seen the individual; (2) How consistent the opinion is with other evidence; (3) The degree to which the source presents relevant evidence to support an opinion; (4) How well the source explains the opinion; (5) Whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) Any other factors that tend to support or refute the opinion."

> These factors are set in the following context:
>
> With the growth of managed *health care in recent years and the emphasis on containing medical costs*, medical sources who are not "acceptable medical sources," such as nurse practitioners, *physician assistants*, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, *are important and should be evaluated on key issues such as impairment severity and functional effects*, along with the other relevant evidence in the file.

*See,* SSR 06-03p (emphasis added).

In giving the clinical nurse's opinion little weight, the ALJ sought to buttress the decision by first stating that Nurse Merrill was not an "acceptable medical source." No reference is made to the factors in SSR 06-03p, other than to say that her opinion was inconsistent with DeWolfe-Johnson's ability to "complete several activities of daily living." (AR 72.) Lacking any meaningful context, that reason does not further the ALJ's decision. Additionally, in discounting Nurse Merrill's opinion, the ALJ makes no

mention of: (1) the length or frequency of the treating relationship; (2) Nurse Merrill's specialization(s); and (3) the consistency of Nurse Merrill's evidence with other evidence in the record (for *e.g,* with Dr. Champagne's opinion). All of these factors would tend to lend weight to the opinion. The ALJ's reasoning with regard to Nurse Merrill is insufficient, SSR 06-03p places high importance on these opinions. Accordingly, the court has little choice but to reject the ALJ's assessment of this opinion.[4]

IV. Reassessment of RFC

    a. **Credibility and Weight Afforded to Medical Sources**

The need for the ALJ to flesh out the bases for his credibility determination and treatment of certain medical source opinions means that the RFC finding also requires a reassessment on remand. An RFC assessment is the most a claimant can do despite his or her limitations. The ALJ must assess DeWolfe-Johnson's RFC "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 404.1545(a)(1). The types of evidence required to make an RFC assessment include the claimant's medical history, medical signs and laboratory findings, and medical source statements. SSR 96–8p.

In conducting the RFC assessment, the ALJ concluded the "claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are *not credible* to the extent they are inconsistent with the above residual functional capacity." (AR 68.) The court has discussed earlier why the ALJ's credibility determination was

---

[4] It is also noted that the Commissioner's responsive briefing did not oppose DeWolfe's opening briefing on this issue, leading to waiver of same.

problematic. Since evidence that was discredited in the first decision could well be afforded greater weight on remand, the RFC assessment may well require a fresh look as well. The same can be said for the decision to afford little weight to the opinions of certain medical sources, as those opinions bear directly on DeWolfe-Johnson's possible mental functional impairments. *See generally Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (on remand, the ALJ should take a "fresh look" at the RFC and vocational questions after the credibility issue has been re-evaluated).

## V.  VA Disability Finding

The ALJ also afforded little weight to the Department of Veterans Affairs decision to pay claimant benefits at the 100% disability rate. The ALJ based this decision on three factors: (1) the VA decision was inconsistent with the overall record; (2) it did not take into account evidence of DeWolfe-Johnson's activities of daily living or medical evidence of substantial improvement; and (3) the decision relied heavily on the opinion of Dr. Champagne. The ALJ was entitled to discount the VA decision since its disability determination does not bind the Social Security Administration. *Allod v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006). At the same time, however, many of the reasons that the ALJ gave for affording little weight to the VA decision involve matters that must be addressed on remand, such as the treatment of Dr. Champagne's opinion and the consideration of daily living activities. As a result, it will likely be necessary for the ALJ to take a fresh look at his initial decision to afford little weight to the VA decision.

ORDER

IT IS ORDERED that the decision of defendant Carolyn W. Colvin, Commissioner of Social Security, denying plaintiff Kyla DeWolfe-Johnson application for disability benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 30th day of September, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge